NSAHLAI LAW FIRM
EMMANUEL NSAHLAI, SBN (207588)
Email: nsahlai.e@nsahlailawfirm.com
11755 WILSHIRE BLVD, STE 1250
LOS ANGELES, CA 90025
Tel    : (213) 797-0369
Fax    : (213) 973-4617

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Cameroon Association of Victims of Ambazonia Terrorism Inc., on behalf of itself and its members and victims;<br><br>Plaintiffs,<br><br>vs.<br><br>Ambazonia Foundation Inc., non-profit Maryland corporation; Ambazonia Interim Government, entity form unknown; Ambazonia Governing Council, entity form unknown; Ambazonia Defense Forces, entity form unknown; Tapang Ivo Tanku, an individual; Christopher Anu Fobeneh a.k.a. Chris Anu, an individual.<br><br>Defendants | § § § § § § § § § § § § § § § § § § § § § § § § § § | **Case No.:**<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>1. Violation of 18 U.S.C. § 956: Conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country]<br>2. Violation of 18 U.S.C. § 2339A: Providing material support to terrorists<br>3. Violation of 18 U.S.C. §960: Expedition Against Friendly Country<br>4. Violation of 18 U.S.C. §2339C: Prohibition against financing of terrorism |

-1-

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

## I.    INTRODUCTION

**PLAINTIFF'S OPERATIONS, MISSIONS, OBJECTIVES, ARE BEING IRREPARABLY HARMED, AND ITS VOLUNTEERS, MEMBERS, AND VICTIMS, ARE BEING IRREPARABLY HARMED OR KILLED OR ABUDCTED OR CRIMINALLY THREATENED, BECAUSE DEFENDANTS, WITHIN LOS ANGELES, AND U.S.A., ARE USING THE CITY OF LOS ANGELES, AND THE U.S.A. AS THEIR PLAYGROUND FOR INTERNATIONAL TERRORISM AND INTERNATIONAL TERRORISM FINANCING. LOS ANGELES AND THE UNITED STATES IS NOT A SAFE HARBOR FOR INTERNATIONAL TERRORISM THAT HARMS USA CORPORATIONS.**

1.      Plaintiff the Cameroon Association of Victims of Ambazonia Terrorism Inc. ("CAVAT"), a Los Angeles non-profit corporation, based in Los Angeles, mission statement and objectives are to facilitate, match, and provide humanitarian assistance, including food, water, medical supplies, legal assistance, to victims of Ambazonia terrorism who reside in the conflict regions of Cameroon, namely, the North West and South West ("NOSO") regions of Cameroon. From its base in Los Angeles, CAVAT coordinates, organizes, and helps in providing these services in NOSO.

2.      Defendants Ambazonia Foundation Inc. ("AFI") is a Maryland non-profit corporation whose principal shareholders and supporters reside in Los Angeles. Defendant Ambazonia Interim Government ("AIG"), entity form unknown, is an organization with its major leaders and contributors such as Patience Abiedu, Blaise Che, Paul N. Che, Akwagoh Walters, who all reside in Los Angeles. Defendants Ambazonia Governing Council ("AGC") is the parent organization of co-defendant Ambazonia Defense Forces ("ADF"), with major stakeholders residing in California such as Tapang Ivo Tanku in San Jose, California, Paul N. Che in Central California, and others. Defendants, collectively, are terrorist organizations and terrorist financing vehicles who consistently obstruct, hamper, destroy, CAVAT's operations, as well as

have conspired to acts of killing, kidnapping, abduction, destruction of property, of CAVAT in the North-West and South-West ("NOSO") regions of Cameroon. These defendants are engaged in international terrorism in NOSO, violent, violent extremism, and hate crimes that harms the operations and mission objectives of CAVAT, and kills, maims, tortures, beheads, or conspires to commit some other atrocity against CAVAT's membership, victims CAVAT seeks to help, or CAVAT's volunteers.

**"Total Lockdown" ordered from February 6, 2020 to February 12, 2020 in NOSO and orders to kill, abduct, or harm anyone that leaves their homes during that period.**

3.      In multiple social media posts on Facebook, video shows on Facebook, videos posted on his YouTube Channel, the official spokesperson of the defendants the Ambazonia Governing Council ("AGC") as well as of the Ambazonia Defense Forces ("ADF"), Tapang Ivo Tanku, from his residence upon information and belief in San Jose, CA, has indicated that between the periods of February 6 through February 12, 2020, there will be a "total lockdown" of the North West and South West ("NOSO") regions of Cameroon, and instructed their armed groups that anyone who steps out during that lockdown, or operates any business, will be abducted, or killed. One of the YouTube videos is found at this link[1], at about minutes 22 through 22 of the video, and again at about minutes 24:50 through 25:50 of the video ( at the time of writing, the YouTube link below is still active, but plaintiff has requested that YouTube delete the account as it is a violation of the material support of terrorism statutes).

4.      In multiple other social media posts, audio messages, and audio-visual posts on Facebook and YouTube, the president of the AGC and ADF Cho Ayaba, has

---

[1] https://www.youtube.com/channel/UCunExpHxzXUz6A4ZpvCcNDA/videos

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

confirmed the total lockdown order of February 6, 2020 through February 12, 2020, and instructed their armed groups that anyone who steps out during that lockdown, or operates any business, will be abducted, or killed. All other defendants rigorously follow this policy and have directed it, the "total lockdown."

5.     The orders of a "total lockdown" will irreparably harm CAVAT's operations, and cause likely death to its volunteers, its members, its victims, who require CAVAT's assistance during that period, as well as CAVAT volunteers who need to move around in NOSO.

**Making the North West and South West regions of Cameroon "ungovernable" through acts of terrorism, killings, beheadings, torture, destruction of property, civilian intimidation, and chaos.**

6.     The official policy of defendants is to make the North West and South West regions of Cameroon "ungovernable", and by that, they mean they want to terrorize civilians, instill fear, insecurity, chaos, mayhem, criminal threats to civilians, harass, abuse, disturb the peace, conspiracy to kill, abduct, harm persons, and destroy property, in order that the territory they claim to be theirs should be abandoned to them. In so doing, defendants harm CAVAT's operations irreparably, making it extremely difficult, sometimes nigh impossible, for its Los Angeles operations to recruit, coordinate, and maintain its volunteers in NOSO, as well as irreparably harming CAVAT's members and victims who reside in NOSO.

7.     These twin policies of defendants, the "total lockdown" set for February 6, 2020 through February 12, 2020, and the making NOSO "ungovernable" will cause CAVAT operations to cease, and will make it likely that CAVAT's volunteers, its members, and victims, who need humanitarian services during this period, and need to move about, will be harmed, likely resulting in death or serious bodily injury.

**NATURE OF ACTION**

1.    This is an action for Temporary Restraining Order, Preliminary and Permanent Injunction, against Defendants and, pursuant to the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA") for conspiring in furtherance of acts of international terrorism, and for engaging in an expedition against a friendly country. A Congressional excellent rendition of the history and purposes of 18 U.S.C. § 2333A ("the material support of terrorism statutes") can be reviewed here.[2]

2.    The ATA's civil remedies have served as an important means for enforcing the federal criminal anti-terrorism provisions since the early 1990s.

3.    Congress enacted the ATA in October 1992 as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad, specifically intending that the civil provisions would not only provide a mechanism for compensating victims of terror but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

4.    Following the bombing of the World Trade Center in New York by al-Qaeda in1993, Congress targeted terrorist resources again by enacting 18 U.S.C. § 2339A in September 1994, making it a crime to provide material support or resources knowing or intending that they will be used in preparing or carrying out terrorist acts.

5.    In April 1996, Congress further expanded the effort to cut off resources to terrorists by enacting 18 U.S.C. § 2339B, making it a crime to knowingly provide material support or resources to a designated foreign terrorist organization.

6.    In the wake of the terror attacks on the United States by al-Qaeda on September 11, 2001 killing nearly 3,000 Americans, Congress amended the "material support" statutes, 18 U.S.C. §§ 2339A-B, via the PATRIOT Act in October 2001 and the Intelligence Reform and Terrorism Prevention Act of 2004, to impose greater

---

[2] https://fas.org/sgp/crs/natsec/R41333.pdf

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

criminal penalties for violating these statutes and to expand the definition of "material support or resources" prohibited thereby.

7.     The Ambazonia Interim Government ("AIG") is the self-anointed "government" of a most violent and repressive Ambazonian separatist movement, and, upon the coordination and planning and support and conspiracy of co-Defendants, it has pooled together all armed separatists fighters in their "Ambazonia" region under its Umbrella in joint command, control, and coordination with co-defendants.

8.     In reality, the AIG and co-Defendants Ambazonia Foundation Inc. are international terrorists, engaging in the material support of terrorism in the conflict region of Cameroon.

9.     Ambazonia Foundation Inc., on information and belief, materially misrepresented their true intentions to the IRS in seeking non-profit 501c status. A complaint referral against each of them was referred to the IRS and to the Department of Assessments and Taxation, Maryland.

10.     Corporate defendants, such as AFI, as non profit corporations, are not supposed to engage in political and legislative lobbying which they consistently do, nor the purchase of firearms, or material support of crimes and violence – they have raised funds, and financed armed separatists in Cameroon which have killed plaintiffs laborers, cut their fingers, burnt their houses, if they disobeyed their edicts, such as, "ghost town," which prevents any civilian from stepping out of their home or going to work.

11.     Officially, defendants aim to raise the cost of Cameroon's government in the North West and South West regions of Cameroon to be higher than the profits the country gets from there; their aim is to make North-West and South-West regions of Cameroon "ungovernable" ( as publicly declared), and to coerce, intimidate, kill,

kidnap, harm any innocent civilians who do not obey or agree or subscribe to their political goals.

12.   At several points in 2018, Amnesty International and Human Rights Watch have accused the AIG separatists, materially supported by co-Defendants, of violently enforcing the boycott of government schools by destroying over 40 schools and assaulting teachers who refused to comply. They've also been accused of kidnapping civilians suspected of working with the government.

13.   Defendants knowing provide material support to the AIG, its fighters, agents, and related organizations, with the knowledge and intent, that they execute violent acts and crimes, in violation of USA laws, and such violent acts and crimes, not only harm Cameroonians living within Cameroon, but also a substantial portion of USA citizens of Cameroonian origin, whose parents, siblings, children, extended family are killed, businesses ruined, property stolen, and thus they suffer intolerable pain and anguish; or kidnappings, and the US based Cameroonians are contacted to pay ransom, as happens hundreds of times.

14.   By providing material support and platform, including holding fund raising activities for the armed separatist groups in Cameroon that are causing death to and irreparable injuries to plaintiffs,  Defendants have violated the federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A), and committed acts of international terrorism as defined by 18 U.S.C. § 2331, as well as violated numerous other Federal and State criminal laws, as described further below. Accordingly, Defendants are liable pursuant to 18 U.S.C. § 2333 to the plaintiffs, who were injured by reason of acts of international terrorism.

15.   Plaintiffs' claims are based upon Defendants command, control, and operation of the armed separatist fighters that cause them irreparable harm and injury, and their provision of the financing and fund raising vehicle, corporate entity,

appearance of legitimacy infrastructure, platform, which provides material support to AIG and related armed separatists in Cameroon.

## THE PARTIES

16.     Plaintiff CAVAT, a California non-profit corporation, based in Los Angeles, but acts as a conduit, organizer, coordinator, and seeks to provide and facilitate humanitarian services for victims of Ambazonia terrorism, including providing them with humanitarian assistance such as water, food, and medical supplies, and legal services against their oppressors-terrorists.

17.     Prior to incorporating, CAVAT's members informally assisted victims of Ambazonia Terrorism with water, food, medical kits, and facilitated legal services for victims. It also helps some resettlement for members in safer regions of Cameroon.

18.     As set forth in great detail below, implementation of defendants "total lockdown" order set for February 6, 2020 through February 12, 2020, as well as defendants continuous violations of the multiple penal code statutes, and the causes of actions listed in this Complaint, has caused substantial harm to CAVAT and its members, and will continue to harm them. The rights of its members that CAVAT seeks to vindicate here are inextricably bound up with its organizational mission and purpose, and its members face numerous hurdles to bringing this suit in their own name. In fact, a CAVAT member who filed a lawsuit against one of the leaders of the defendant entities, and who was represented by the undersigned, was, on information and belief, poisoned by defendants on or about October 28, 2019, and defendants claimed responsibility for his death. Hence, the individual CAVAT members are scared to death of being individually named in any lawsuit against these currently operative terrorist organizations, and their terrorist leaders and armed groups. The undersigned attorney of record for plaintiff has also had public death threats posted on Facebook against him, as well as kidnappings of his Uncle, in a pressure tactic designed to get him to drop any lawsuits on behalf of victims of Ambazonia terrorism.

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

19.     Defendant Ambazonia Interim Government ("AIG"), form of business unknown, is an organization that has declared itself the "government" of the "Ambazonia" people. Its website notes it is the "Interim Government Official Site Federal Republic of Ambazonia."[3] A good portion of its founders, cabinet members and major financial backers reside in Los Angeles, such as Patience Abiedu, Paul N. Che, a California State employee, who works as a nurse at the California Department of Corrections and Rehabilitation, Akwagoh Walters, and others, including Yannick Sicot.

20.     Defendant Ambazonia Foundation Inc. ("AIF") is a non profit corporation incorporated in the State of Maryland. It is the official vehicle of the defendant AIG, which uses its non-profit status for fund raising for its terrorist and other malign and criminal activities, as well as for a legal entity cloak. The main members of the AIG are the same as those of the AIF.

21.     Defendant Ambazonia Governing Council ("AGC"), form of business unknown, is an organization that has dedicated itself to free Ambazonia through an armed insurgency and violence from Cameroon. It's official spokesman is Tapang Ivo Tanku, residing in San Jose, California, and its prominent financial backers such as Paul N. Che and Akwagoh Walters are residents of Central California, and Los Angeles respectively.

22.     Defendant Ambazonia Defense Forces ("ADF"), form of business unknown, is the armed wing of the AGC, directly tasked with implementing the military, violent, terrorist, and criminal orders of the AGC. It has essentially the same leaders and backers as noted above.

23.     Defendant Tapang Ivo Tanku is a resident of San Jose, California, and the official spokeman, and one of the de facto leaders, of the ADF and AGC. It was

---

[3] https://www.ambazoniagov.org/

-9-

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

ordered on February 3, 2020, that California has personal and subject matter jurisdiction over him, after he contested jurisdiction, in a case where a Temporary Restraining Order was obtained against him for "terrorizing" Paddy Asanga, case at Los Angeles Superior Court, case no.: 19CHR00169. Tapang also lost his arguments against jurisdiction in an un-related anti-terrorism complaint filed at the Northern District of California, case of John Doe, Jane Doe v. Tapang.

24.     Collectively, defendants AGC and the ADF and individual defendant Tapang Ivo Tanku, being essentially one and the same entity, will be referred to as "the AGC defendants".

25.     Defendant Christopher Anu Fobeneh a.k.a Chris Anu, is one of the de facto leaders of the AIG and AIF, and the official secretary of communications, for both. He has appeared multiple times in Los Angeles, for fund raisers for his organization, and maintains many prominent partners in Los Angeles, CA. He was also sued in an anti-terrorism complaint in Los Angeles, and made a general appearance, case of Jane Doe v. Christopher Anu Fobeneh.

26.     Collectively, defendants AIG and AIF, being essentially one and the same entity, will be referred to as "the AIG defendants."

27.     All defendants, when referred to collectively jointly, will simply be referred to as "defendants."

28.     Defendants main objectives and reasons for existence are the same: obtain secession of the North West and South West Regions of Cameroon ("NOSO") by making the regions "ungovernable," as well as during the period February 6, 2020 through February 12, 2020, implementing a total lockdown of the territory.

## JURISDICTION AND VENUE

29.     The Court has jurisdiction over this case under 28 U.S.C. §1331 (federal question jurisdiction).

-10-

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

30.     This Court, in addition, has subject matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 2331.

31.     Venue lies in the Central District of California because the plaintiff resides in this district.

32.     Venue is further proper in this district pursuant to 18 U.S.C. §2334(a) because defendants have agents in this district.

33.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

34.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(h), 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

## II.     FACTUAL ALLEGATIONS

## A. LEGAL BACKGROUND: ANTITERRORISM LEGISLATION

### i.     The Antiterrorism Act ("ATA")

35.      In the 1980's, terrorist groups carried out a number of major terror attacks around the world, killing and injuring many Americans abroad.

36. Among these terror attacks were:

    a. The April 1983 suicide bombing of the U.S. Embassy in Beirut, Lebanon, killing 63 people, including 17 Americans;

    b. The October 1983 suicide bombing of U.S. Marine barracks in Beirut, Lebanon, killing 241 U.S. Marines and injuring more than 100;

    c. the December 1983 terrorist bombings of the U.S. Embassy and the residential quarters of American company Raytheon in Kuwait;

    d. The September 1984 terrorist bombing of a U.S. Embassy annex northeast of Beirut, Lebanon;

    e. The June 1985 hijacking of TWA flight 847;

-11-

f. The October 1985 hijacking of the Achille Lauro cruise ship and murder of wheelchair-bound American Leon Klinghoffer; and

g. The December 1985 terrorist bombings of the Rome and Vienna airports.

37. In response to these attacks, Congress in 1986 amended the U.S. Criminal Code, Title 18, Part I, to add a new chapter titled, "Extraterritorial Jurisdiction Over Terrorist Acts Abroad Against United States Nationals."

38. This new chapter contained a new section titled, "Terrorist acts abroad against United States nationals," providing criminal penalties for killing, conspiring, or attempting to kill a national of the United States, or engaging in physical violence with the intent to cause serious bodily injury to a national of the United States or that results in serious bodily injury to a national of the United States.

39. In addition, Congress later enacted the ATA, which established a private cause of action for U.S. nationals injured by acts of international terrorism, as a legal complement to the criminal penalties against terrorists that kill or injure Americans abroad.

40. In enacting the ATA, Congress specifically intended that the civil cause of action would not only provide a mechanism for compensating victims of terror, but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

41. As the ATA was being considered in Congress, the State Department's Deputy Legal Advisor, Alan J. Kreczko, testified before the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice that this proposed

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

bill "will add to the arsenal of legal tools that can be used against those who commit acts of terrorism against United States citizens abroad."[4]

42.     The Deputy Legal Advisor also testified:

"[T]his bill will provide general jurisdiction to our federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas.

We view this bill as a welcome addition to the growing web of law we are weaving against terrorists. . . . The existence of such a cause of action . . .may deter terrorist groups from maintaining assets in the United States, from benefiting from investments in the U.S. and from soliciting funds within the U.S. In addition, other countries may follow our lead and implement complimentary national measures, thereby increasing obstacles to terrorist operations.

Moreover, the bill may be useful in situations in which the rules of evidence or standards of proof preclude the U.S. government from effectively prosecuting a criminal case in U.S. Courts. Because a different evidentiary standard is involved in a civil suit, the bill may provide another vehicle for ensuring that terrorists do not escape justice."[5]

43.     Likewise, Senator Grassley, one of the sponsors of the bill, explained a purpose of ATA's civil cause of action as follows:

"The United States must take a strong stand against terrorism. The Department of State testified that this bill would add to the arsenal of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad. . . .

Now is the time for action. Now is the time to strengthen our ability to both deter and punish acts of terrorism.

We must make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them most: at their lifeline, their funds."[6]

---

[4] "Statement of Alan J. Kreczko, Deputy Legal Adviser, On S. 2465: A bill to provide a new civil cause of action in federal court for terrorist acts abroad against United States nationals," Before the Subcommittee on Courts and Administrative Practice of the Senate Judiciary Committee (July 25, 1990), https://www.state.gov/documents/organization/28458.pdf.

[5] Id.

[6] 36 Cong. Rec. 26716-26717 (Oct. 1, 1990), https://www.gpo.gov/fdsys/pkg/GPO-CRECB-1990-pt19/pdf/GPO-CRECB-1990-pt19-1.pdf.

44.      In July 1992, a Senate Committee Report explained that the ATA's treble damages provision "would interrupt, or at least imperil, the flow of money" to terrorist organizations.

45.      In October 1992, Congress enacted ATA's civil provisions, including 18 U.S.C. §2333.

## B.      The "Material Support" Statutes and Regulations

46.      On February 26, 1993, a group of *al-Qaeda* terrorists detonated a truck bomb under the North Tower of the World Trade Center in New York City, attempting to cause the collapse of both towers and the death of thousands of Americans.

47.      Although the damage from the World Trade Center bombing was limited, it nevertheless killed six people and injured more than one thousand.

48.      In response, Congress again took aim at the resources available to terrorists in September 1994 and enacted 18 U.S.C. § 2339A, making it a crime to provide material support or resources to terrorists, knowing or intending that they would be used for terrorist acts.

49.      DEFENDANTS and DOES Defendants engage in the provision of material support of terrorism through their AIG and its agents and soldiers, as Defendants conduct through fund raising meetings, declarations for actions which incite immediate and imminent hard to innocent civilians, their officially declared aim of conduct intimidation and threats against civilians, of kidnappings, and their acknowledged kidnappings, killings, of civilians they find non-compliant with their civilian goals. DEFENDANTS provide expert advice or assistance, personnel, training, and service to the AIG and related armed separatists who conduct acts of violence, intimidation, killings against civilians in the Anglophone regions of Cameroon.

## C. International Laws

43.      The conduct of DEFENDANTS as detailed herein to provide substantial material support, resources and sponsorship for Armed separatists and its

-14-

acts of international terrorism resulting in the Attack that that killed, maimed, tortured, and burnt plaintiffs employees, laborers, and agents. constitutes a clear violation of the law of nations and international law, which includes international legal norms prohibiting crimes against humanity, mass murder, genocide, torture, extrajudicial killing, air piracy, financing of terrorism, and terrorism, which can be found in and derived from, among other things, the following conventions, agreements, U.N. declarations and resolutions, and other documents:

D. Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

E. Allied Control Council Law No. 10 (Dec. 20, 1945);

F. Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9 1948, 78 U.N.T.S. 277;

G. Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

H. Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

I. International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

J. International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force Apr. 10, 2002);

K. U.N. Security Council Resolution 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999);

L. U.N. Security Council Resolution 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001);

M. Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

N. Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609;

O. Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res.808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S.C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

P. The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 1121;

Q. The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

R. The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

**DEFENDANTS ORDERS OF TOTAL LOCKDOWN FEBRUARY 6, 2020 TO FEBRUARY 12, 2020 IRREPARABLY HARMS CAVAT'S OPERATIONS, AND PLACES IN DANGER OF DEATH OR SERIOUS BODILY INJURY ITS VOLUNTEERS, MEMBERS, AND VICIMS**

50.     In multiple other social media posts, audio messages, and audio-visual posts on Facebook and YouTube, the chairman of the ADF Benedict Kuah, has confirmed the total lockdown order of February 6, 2020 through February 12, 2020,  and instructed their armed groups that anyone who steps out of their homes during that lockdown, or operates any business, will be abducted, or killed.

51.     On January 7, 2020, the Secretary of Communications of the Ambazonia Interim Government ("AIG") noted that there will be a total lockdown of NOSO during the periods February 6, 2020 through February 12, 2020. A link to that message

is found here [7], , and instructed their armed groups that anyone who steps out of their homes during that lockdown, or operates any business, will be abducted, or killed.

52.     On January 7, 2020, the armed militia groups under the leadership and control of the AIG, with a local commander who has self-titled himself "Field Marshall", and is the brother of Chris Anu, in an audio video stated that his armed groups, their proxies and affiliates, under the Umbrella of the AIG and their instructions, will enforce a total lockdown of NOSO during the period February 7, 2020 through February 12, 2020, and they warned and threatened all civilians and administrators that anyone who steps out of their residence during that lockdown, or operates any business, will be abducted, or killed

53.     On multiple other occasions, from the start of 2020 to present, the defendants, their agents, assigns, those in active participation and concert with them, have repeatedly stated that there is a "total lockdown" of the territory called "Ambazonia", and any civilian who disobeys this "total lockdown" order will be killed, abducted, or other harm will befall him.

54.     On multiple occasions, defendants have further warned any businesses that operate that they will be burnt or destroyed should they not obey this "total lockdown."

55.     Faced with this total lockdown ordered by defendants, plaintiff will be unable to execute is mission statement and objectives, provide humanitarian assistance to victims in NOSO, and ensure the security of its volunteer staff.

56.     Each of the specific attacks noted in this complaint were executed under the direct orders of defendants, either the AGC defendants or AIG defendants, as they command, control, and finance the armed groups.

57.     Defendants raise funds regularly, using the robust wealth of their sympathizers in the United States, to buy weapons, bullets, other supplies and

---

[7] https://www.youtube.com/watch?v=zbjJyEm2J1o&t=1268s

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

equipment, as well as pay, the armed groups in NOSO with instructions to make NOSO "ungovernable" and implement any policies they direct.

58.    The AIG defendants raised funds through a scheme dubbed "MytriptoBuea"[8] where donations were accepted online. They have also launched fundraising efforts, with the declared aim in their video posts and messages, to finance their armed groups with these funds.

59.    The AIG defendants have come up with other schemes to obtain financing for their terrorist activities, including launching a buying bonds initiative at www.ambabondholders.com      and     other     fund     raising     initiatives     at www.ambazoniagov.org .

60.    The AGC defendants used the website www.nchangshoeboys.org ( currently disabled by plaintiff's attorney in conjunction with a third party because it violates the material support statute) to raise financing for the AGC armed groups in NOSO.

61.    Defendants also use various CashApp, PayPal, Bank of America, and financial institutions accounts to raise money, and send to their armed groups in NOSO, to implement their policies.

**DEFENDANTS    OFFICIAL    POLICY    OF    MAKING    NOSO "UNGOVERNABLE" HARMS CAVAT'S OPERATIONS, ITS MEMBERS, AND ITS VICTIMS**

**62.**    In multiple statements to the press and on social media, the President of the AGC Cho Ayaba, has expressed in multiple social media posts and interviews that his organizations goal is to obtain separation from Cameroon by making NOSO

---

[8] https://www.mytriptobuea.com/

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

"ungovernable", so the cost of the alleged "occupation" of the territory he calls "Ambazonia" is so high and prompts the Cameroon government to allow separation.

63.     The Chairman of the ADF, Benedict Kuah, has expressed in multiple social media posts and interviews that his organizations goal is to obtain separation from Cameroon by making NOSO "ungovernable", so the cost of the alleged "occupation" of the territory he calls "Ambazonia" is so high and prompts the Cameroon government to allow separation.

64.     The spokesman of the ADF, Ivo Tapang Tanku, has expressed in multiple social media posts and interviews that his organizations goal is to obtain separation from Cameroon by making NOSO "ungovernable", so the cost of the alleged "occupation" of the territory he calls "Ambazonia" is so high and prompts the Cameroon government to allow separation. See, for example, **Exhibit A** attached to this Complaint.

65.     The President of the AIG, Sako Ikome, as well as the Secretary of Communications, Christopher Anu Fobeneh a.k.a Chris Anu, who are also the de facto founders and leaders of the AIF, have let it be known that their organizations' goal is to obtain separation from Cameroon by making NOSO "ungovernable", so the cost of the alleged "occupation" of the territory he calls "Ambazonia" is so high and prompts the Cameroon government to allow separation. See, for example, **Exhibit B** attached to this complaint.

66.     In order to make these territories ungovernable, defendants have resorted to terror tactics of killings, maiming, beheading, burning houses of dissenters, threatening any civilians who does not obey their orders, torture, abductions, and other violent crimes. See, for example, **Exhibit C**.

67.     During the 2018 through 2019 academic year, a total of 19 teachers and 58 students were kidnapped by defendants' armed groups at the Universities of Bamenda and Buea. CAVAT was contacted by some of the parents and the students to provide and counsel on post traumatic stress assistance, legal assistance and

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

options, and possible resettlement. Some of the students and their families are members of CAVAT, and also victims that CAVAT seeks to help. Defendants armed groups threatened CAVAT's volunteers with death or torture when they tried to have open tents at the Universities of Buea and Bamenda, in order to help any students in need of legal relief for their harm, post traumatic stress referrals, and possible resettlement.

68.     In January of 2019, Woutai Vondou Oliver, a history and Geography teach at the Nitop High School in Bamenda, was beheaded because he disagreed with the armed groups political goals as set out by defendants. CAVAT volunteers were warned not to investigate the incident or to seek legal redress for the beheading.

69.     CAVAT was compelled to stop its operations of providing humanitarian assistance to a few families in Mbui division in February of 2019 when attacks by the armed groups, under the instructions of defendants, were committed in the offices of ENIEG Njinkkedjem and GTTS/ENIET, with major looting occurring as well as threats to the civil servants there. This caused widespread fear in the area, and CAVAT had to stop operations there.

70.     Other specific attacks committed by the armed separatist groups, under the direct orders of defendants, in seeking to make NOSO ungovernable, and which harmed and caused injury to CAVAT's operations and executing its mission statement, include:

71.     Armed separatists setting fire on February 25, 2019 to Espoir College and APAWYS Secondary School.

72.     Armed separatists shooting at civilians in Bangem in Kupe-Muanenguba in April of 2019.

73.     Numerous incidents of kidnappings and hostage taking in areas of NOSO where CAVAT seeks to provide assistance to victims and its members.

**74.** Kidnappings of civilians and students in Kumbo, and particularly Saint Augustin College, Kumbo.

**75.** Faced with such a policy of making NOSO ungovernable through violations of the penal codes noted in this Complaint, CAVAT volunteers often stopped working for fear of their lives and safety. For example, when CAVAT, while an unincorporated association, began some humanitarian relief activities in September of 2018, US missionary Charles Wesco was shot dead. [9] This immediately chilled any continuation of CAVAT's mission objectives for a few months, as everyone was scared. The armed groups, directed by defendants, were on a violent terrorist spree, as they sought to intimidate civilians into accepting their political position of separation, as well as influence the Cameroon government.

**76.** On various dates, specifically February 23, 2019, May 18, 2019, August 27, 2019, armed groups, under the instructions and directions of defendants to make NOSO ungovernable, seized and destroyed CAVAT's food items at a bus station in Bamenda. Similar actions have occurred in different areas of NOSO, particularly in Kumbo, Wum, and Mbengwi.

**77.** Defendants in ordering total lockdown and making NOSO ungovernable have provided instructions to their armed groups to destroy and block humanitarian supplies from many organizations, including CAVAT, as their policy of making NOSO ungovernable, and to influence the Cameroon government.

**78.** Defendants actions consistently put CAVAT's volunteers, members, victims at risk of harm, grave bodily injury, and it has happened on dozens of occasions.

**79.** Defendants actions in ordering total lockdown and making NOSO ungovernable prevent CAVAT from the delivery of humanitarian assistance to its members, victims, and those in need.

---

[9] https://www.bbc.com/news/world-africa-46044404

**80.**    Defendants actions in ordering total lockdown and making NOSO ungovernable present insurmountable difficulties in CAVAT executing its mission and objectives in NOSO.

**81.**    On November 30, 2019, Mr. Pascal Ngwayl, a like-minded humanitarian assistance worker was abducted and later killed by armed men in Donga Mantung Division of the North-West region. His death received wide coverage, and was reported in a Press Statement by the United Nations. [10] CAVAT suffered many volunteers resigning, for fear of their lives and safety.

**82.**    On Sunday January 19, 2020, in Sang in Bali-Nyongha, an ordained Pastor of the Presbyterian Church in Cameroon ( PCC) in pastoral attire was abducted in the church compound after worship service by armed groups, was brutalized, incarcerated, later released and hospitalized. The incident was widely reported, and noted by the Office of the Moderator, Presbyterian Church in Cameroon. Accordingly, CAVAT volunteers and activities had to cease in that area due to the fear by CAVAT volunteers and members that a similar incident will happen to them.

83.    The actions and conduct of defendants violate multiple United States penal codes ("predicate offenses"), including, without limitation:

a. **International Terrorism**: "International terrorism," according to 18 U.S.C. § 2331 is defined as "activities that involve acts or acts dangerous to human life that are in violation of the criminal laws of the United States or of any State, that would be a criminal violation if committed within the jurisdiction of the United States or of any State."

b. 18 U.S.C.  §2(a) —    Aiding, abetting, counseling, commanding, inducing or procuring a federal crime;

---

[10] https://reliefweb.int/report/cameroon/un-humanitarian-coordinator-cameroon-condemns-killing-abducted-aid-worker-north-west

-22-

c.  18 U.S.C. §371 — Conspiring to commit a federal crime;

d.  18 U.S.C. §2332b — Conspiring to commit an act of terrorism;

e.  18 U.S.C. §2339A - Providing material support to terrorists;

f.  18 U.S.C. §2339C - Prohibitions against the financing of terrorism;

g.  18. U.S.C. § 1956 – Conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country;

h.  18. U.S.C. § 1960 – Expedition against friendly country.

i.  Other Federal crimes such as:  Accomplice liability – Aiding and Abetting Law; Criminal Conspiracy (to crimes of murder, kidnappings, arson, assault, battery, without limitation); Accessory to crimes before and after the fact (to crimes of murder, kidnappings, arson, assault, battery, without limitation)

**HUMAN RIGHTS LAWS VIOLATED**

j.  Charging torture (18 U.S.C. §§ 2340-2340B)

k.  War crime (18 U.S.C. § 2441)

l.  Genocide (18 U.S.C. §§ 1091-1093)

m. Child soldiers (18 U.S.C. § 2442)

**ORGANIZED CRIME AND RACKETEERING**

n.  Violent crimes in aid of racketeering (18 U.S.C. § 1959)

o.  Plaintiffs respectfully request that the Court issue appropriate declaratory relief and preliminary and permanently enjoin defendants penal code violations as a whole.

**Kidnappings: CAVAT is unable to execute its mission to provide victims of kidnappings with humanitarian and legal assistance.**

84.     In November of 2018, at least 79 pupils and several other adults and staff members were kidnapped in Bamenda, Cameroon by the AIG defendants separatist forces under instructions from defendants based on their policy of making NOSO

"ungovernable." CAVAT sought to provide help to the pupils and their parents with matching them for post traumatic stress counseling and resettlement counseling, but the armed groups threatened to destroy the bus carrying CAVAT volunteers if it "entered Abakwa."

85.    In February of 2018, 170 pupils were kidnapped in Kumbo by secessionist armed groups of defendant the AGC defendants, under the instructions and directions of the AGC defendants. CAVAT sought to help but the armed groups had destroyed the roads leading to Kumbo.

**Right to Education and child welfare abuses: CAVAT cannot execute its mission for students who are victims, and provide humanitarian assistance to them.**

86.    UNICEF has estimated that the militia-backed ban on education has led to school closures that have directly impacted 600,000 children in the Anglophone regions.114 In addition to this, the same report estimates that more than 80% of schools in the anglophone regions of Cameroon have been closed down due to the conflict. There have also been some reports that the increased vulnerability of children during the conflict has allowed secessionist militias to utilise child soldiers, drawing from boys currently out of education due to the large-scale closure of schools. [11]

87.    Plaintiffs seek such relief against DEFENDANTS for the attributable acts of the armed separatist groups in the North West and South West regions of Cameroon, its bodies, alter -egos, and officers, employees and agents acting within the scope of their office, employment or agency by DEFENDANTS knowingly providing material support and resources to the Armed separatists and facilitating the deaths of hundreds of others, in that, as set forth in detail herein, they:

---

[11] https://www.state.gov/wp-content/uploads/2019/03/Cameroon-2018.pdf

a.  Provide training, lodging, weapons, expert assistance, and financial support to armed separatists groups to engage in terrorist activities, including intimidation of civilians, and destruction of property.

b.  Provide financing for the terrorist training camps in the North-West and South-West regions of Cameroon where Armed separatists indoctrinated and taught their soldiers how to carry out guerilla warfare, intimidation, violence, and terrorism against any military or uncooperative or unsupportive civilians.

c.  Provide critical logistical support and resources to Armed separatists around North-West and South-West regions of Cameroon, funding safe houses, transferring Armed separatists money, weapons and equipment across international borders and other assistance, all of which enabled Armed separatists to conduct the attacks that killed plaintiffs parents and kills scores of other civilians, as well as resulted in total economic losses for plaintiff.

d.  Actively supported armed separatist groups in its final preparations for the hit and run attacks and kidnappings,  through a network of the their soldiers, officers, and/or agents who met with and aided the AIG killers, providing them with money, cover, advice, contacts, transportation, assistance and other material support and resources.

88.  Provide expert advice or assistance to the AIG and related organizations through their regular Facebook postings, YouTube videos,  which advises armed separatist fighters how, when, to act, stance to adopt, how to react, and instructions on punishments to meter to innocent civilians who don't obey, including plaintiffs parents.

89.  All the above-noted actions are in violation of 18 U.S.C. §§ 2339A and related anti-terrorism and criminal statues, the statutes that prohibits the provision of

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

1 material support with the knowledge or intent that the support be used to carry out a
2 terrorist attack, and other criminal statutes.

3     90.    Due to the above-noted actions, at several periods circa September 2016
4 to present, whenever plaintiff's laborers, workers, agents go to plaintiff's place of
5 business, they are killed, kidnapped, their fingers cut, maimed, tortured, or other
6 despicable act committed against them, all arising from the instructions of Defendants.

7

8     **DEFENDANTS's specific intent and knowledge of the armed separatists**
    **terrorist agenda from October 2016 to present which hinders CAVAT'S**
9     **operations.**

10     91.    At all relevant times mentioned herein, defendants adopt an extremist
11 version of separation from Cameroon, seeking violence and terror and kidnappings
12 and intimidation against any non-compliant civilian as the means to achieve secession
13 from the Republic of Cameroon, causing CAVAT great harm it is operations and
14 mission objectives.

15

16     **DEFENDANTS's tortious acts were a proximate cause of inability of**
    **CAVAT to execute its mission objectives.**
17

18     92.    Defendants provide the direct orders to harm, abduct, kill, and destroy
19 property, thus stopping CAVAT from being able to provide humanitarian assistance,
20 resettlement and legal help, to victims in NOSO.

21     93.    CAVAT regularly losses volunteers because of the orders by defendants.
22     94.    CAVAT has lost dozens of its members who were killed because of the
23 orders of defendants to make NOSO "ungovernable."

24     **DEFENDANTS's direct funding of the armed group with**
25     **instructions to commit the specific attacks mention in this Complaint and**
26     **to make NOSO "ungovernable", and in so doing, knew or recklessly**

27

-26-
28

**disregarded that their payments will hinder CAVAT'S operations, its members, and its victims.**

95.  Defendants are responsible for coordinating and raising substantial funding for the armed groups that are vital to the armed groups ability to prevent CAVAT from operating, because they threaten, intimidate, abduct, and kill many persons who seek peace and to provide humanitarian relief.

**DEFENDANTS's material support for NOSO separatists armed groups' planning and execution of the attacks that scares CAVAT's volunteers, blocks its operations, kills victims, and CAVAT members.**

96.  Defendant provide material support and resources for separatist armed groups. Their material support of terrorism and crimes includes:

i.   Fund raising

j.   Using their Facebook posts, or that of their leaders such as Eric Tano Tataw and Chris Anu, to provide instructions on strategy, policy, and AIG regulations

k.   Recruiting of armed separatists

l.   Assistance with procuring and providing weapons, equipment, and other tangible materials.

m. Coordination with other separatists groups abroad and in Cameroon

n.   Leadership of the AIG and AGC in the USA

o.   Expert advice and assistance on how to obtain separation by violence and force from Cameroon

p.   Assistance with the training of armed separatists

q.   Using other social media such as email, twitter, Skype, WhatsApp to promote AIG violent agenda, plan the dates and times of attacks, and other activities in violation of USA laws.

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

r.  Recruiting of administrative personnel in the USA to assist the AIG in all aspects of its goals.

s.  Providing media relations service, coordination services, for the AIG in the USA; and so on and forth, without limitation.

**The Grave Harm to Plaintiff and its members**

97.  Implementation and enforcement of the "total lockdown" order has already caused Plaintiff and its members substantial, concrete and particularized injury, and will continue to harm Plaintiff if not permanent enjoined.

98.  The "total lockdown" order, and the official policy of making Ambazonia "ungovernable" and abducting foreigners, imposes a significant burden on CAVAT's work. As a direct result of this "total lockdown" order and the official policy of making Ambazonia "ungovernable", Plaintiff and its members have suffered substantial, concrete injuries.

99.  The "total lockdown" order and policy of making these territories "ungovernable" has severely restricted CAVAT's ability to carry out its work and mission. CAVAT is hampered, through fear of having its volunteers killed, abducted, or harmed, in providing assistance to victims such as food and water supplies, or medical kits.

100.  The actions and official policies of defendants enormously increase the costs of CAVAT to reach out to its members and help them get humanitarian assistance or seek resettlement, because defendants armed groups destroy roads, threaten neutral workers they see, and stop assistance from reaching victims. These tactics cause CAVAT to spend enormous time and resources to help its members.

101.  The actions, conduct, and official policies of defendants also greatly endangers CAVAT's members, CAVAT's volunteers, and partners.

102.   The actions, conduct and official policies of defendants have caused CAVAT to expend significant resources in pursuing defendants in several litigation.

103.   The actions, conduct and official policies of defendants cause CAVATs members to live in constant danger of death, abduction, harm, torture, or other heinous crime to be committed against them, as CAVAT may be unable to reach them, and get them to safer areas.

104.   The actions, conduct, and official policies of defendants will prevent CAVATs operations in the North West and South West regions ("NOSO").

### FIRST CAUSE OF ACTION

**Violation of 18 U.S.C. § 956: Conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country.**

105.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

106.   Defendants knowingly agreed, formed, organized and control, the armed militia groups in NOSO, to implement their policy objective of making NOSO ungovernable, and to implement their new edict of a total lockdown of the territory slated for February 6, 2020 to February 12, 2020.

107.   Defendants, in acts intended to implement their agreement with the armed militia in NOSO, executed all the specific attacks delineated herein, as well as engaged in massive fundraising for the armed groups in NOSO, so that they may execute their policy goals.

108.   Defendants permitted armed separatists affiliates to register and use Defendants' platform websites, Facebook posts, WhatsApp phone account, twitter, phone communications, financial support, fundraising, actions, participations, and

other services to promote and carry out their objectives of making NOSO ungovernable and instituting the upcoming total lockdown.

109.  Defendant were aware that U.S. federal law prohibited providing engaging in agreements to kill, kidnap, maim or destroy property in a foreign country, and/or engaging in acts constituting international terrorism.

110.  By conspiring with armed separatists in furtherance of their commission, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiff to be injured in its business, defendants acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.

111.  Defendants acts transcend national boundaries in terms of the means by which they are accomplished because they use armed militias and separatists groups operating in NOSO in order to implement their policy objectives of ungovernable and total lockdown on NOSO; in addition, the persons their actions are intended to intimidate or coerce, and the locale of their armed groups they direct and control, is in NOSO.

112.  Defendants actions, and their specific attacks in NOSO, are intended (a) to intimidate or coerce the civilian populations of NOSO, the government of Cameroon, and others, to follow their political goals and objectives
( b ) to influence the policy of the Cameroon government by intimidation, coercion, and ( c ) to affect the conduct of the Cameroon government by mass killings, torture, kidnappings, abductions, destruction of property, arson, and cessation of schools in NOSO.

113.  Plaintiff is a California non-profit corporation who is injured in his business by reason of Defendants' conduct, Plaintiff's mission and objectives to help

1   its members, victims, and to protect its volunteers in NOSO are harmed and injured

2   by defendants actions.

3       114.   As a result of defendants violations of 18 U.S.C. §956, plaintiff is entitled

4   to an injunction and declaratory relief.

5

6                           **SECOND CAUSE OF ACTION**
    **Violation of 18 U.S.C. § 2339A : Providing material support to terrorists**

7       115.   Plaintiffs repeat and re-allege each and every allegation of the foregoing

8   paragraphs as if fully set forth herein.

9       116.   Defendants provided material support to the armed separatist groups in

10  NOSO in violation of 18 U.S.C. § 2339A. They did so by making payments to the

11  armed groups, fundraising activities for the armed separatist groups, providing them

12  with instructions to organize violence in Cameroon. They also enabled the use of their

13  website platforms, Facebook accounts, WhatsApp account, twitter, phone

14  communications, and other services to incite, participate, and direct the activities of

15  the armed separatist groups in carrying out its terrorist activities.

16      117.   Defendants also provided personnel to the armed separatist groups as

17  administrative and logistics help, in order for them to obtain new recruits in their

18  services.

19      118.   These services, equipment, and personnel constituted material support

20  and resources pursuant to 18 U.S.C. § 2339A, and they facilitate acts of terrorism in

21  violation of 18 U.S.C. § 2332 that caused the death of Plaintiff's employees and wife.

22      119.   Defendants provided these services, equipment, and personnel to armed

23  separatist groups, knowing that they were to be used in preparation for, or in carrying

24  out, criminal acts including the acts that injured the Plaintiff, its members, and victims.

25

26

27                                    -31-
    _Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al_
28                          Case .No. _____
                     Complaint For Injunction and Declaratory Relief

120.   As set forth more fully above, but for the material support and resources provided by Defendants to the armed groups, Plaintiffs operations would not be significantly at risk, and its volunteers in constant harms way and danger.

121.   By committing violations of 18 U.S.C. § 2339A that have caused the Plaintiff in his business, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries. Defendants acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 960, 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.

122.   Defendants acts transcend national boundaries in terms of the means by which they are accomplished because they use armed militias and separatists groups operating in NOSO in order to implement their policy objectives of ungovernable and total lockdown on NOSO; in addition, the persons their actions are intended to intimidate or coerce, and the locale of their armed groups they direct and control, is in NOSO.

123.   Defendants actions, and their specific attacks in NOSO, are intended (a) to intimidate or coerce the civilian populations of NOSO, the government of Cameroon, and others, to follow their political goals and objectives ( b ) to influence the policy of the Cameroon government by intimidation, coercion, and ( c ) to affect the conduct of the Cameroon government by mass killings, torture, kidnappings, abductions, destruction of property, arson, and cessation of schools in NOSO.

124.   Plaintiff is a California non-profit corporation who is injured in his business by reason of Defendants' conduct. Plaintiff's mission and objectives to help its members, victims, by providing humanitarian assistance, and to protect its volunteers in NOSO are harmed and injured by defendants actions.

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

125.   As a result of defendants violations of 18 U.S.C. § 2339A, plaintiff is entitled to an injunction and declaratory relief.

**THIRD CAUSE OF ACTION**
**Violation of  18 U.S.C. §960 – Expedition Against Friendly Country**

126.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

127.   Defendants have the specific intention of going to war against the Republic of Cameroon, purchasing guns for their war, fund raising activities for their enterprise, supporting the armed separatists in Cameroon, and using any international terrorism tactics in order to make NOSO "ungovernable" so that it is abandoned by the Republic of Cameroon.

128.   Cameroon is at peace with the United States, and enjoys quite friendly bilateral relations and cooperation at all levels.

129.   As set forth more fully above, but for the violation of this Statute by Defendants, plaintiffs would not significant harm and irreparable harm to its operations, and possible loss of lives of its volunteers.

130.   By committing violations of 18 U.S.C. § 960 that have caused the Plaintiffs to be injured in their Los Angeles based business, Defendants are liable to plaintiff.

131.   Defendants engaged in violations of  18 U.S.C. § 960 by making payments to the armed groups, fundraising activities for the armed separatist groups, providing them with instructions to organize violence in Cameroon. They also enabled the use of their website platforms, Facebook accounts, WhatsApp account, twitter, phone communications, and other services to incite, participate, and direct the activities of the armed separatist groups in carrying out its terrorist activities.

-33-

132.   Defendants also provided personnel to the armed separatist groups as administrative and logistics help, in order for them to obtain new recruits in their services.

133.   These services, equipment, financing, and personnel constitute their expedition against friendly country in violation of 18 U.S.C. § 960, and they facilitate acts of terrorism that injures and harms Plaintiff.

134.   Defendants provided these services, equipment, and personnel to armed separatist groups, knowing that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the Plaintiff, its members, and victims.

135.   As set forth more fully above, but for the expedition against friendly country engaged by Defendants, Plaintiffs operations would not be significantly at risk, and its volunteers in constant harms way and danger of death, abduction, or torture.

136.   By committing violations of 18 U.S.C. § 960 that have caused the Plaintiff injury and harm in his business, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries. Defendants acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 960, 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.

137.   Defendants acts transcend national boundaries in terms of the means by which they are accomplished because they use armed militias and separatists groups operating in NOSO in order to implement their policy objectives of ungovernable and total lockdown on NOSO; in addition, the persons their actions are intended to intimidate or coerce, and the locale of their armed groups they direct and control, is in NOSO.

138.   Defendants actions, and their specific attacks in NOSO, are intended (a) to intimidate or coerce the civilian populations of NOSO, the government of Cameroon, and others, to follow their political goals and objectives ( b ) to influence the policy of the Cameroon government by intimidation, coercion, and ( c ) to affect the conduct of the Cameroon government by mass killings, torture, kidnappings, abductions, destruction of property, arson, and cessation of schools in NOSO.

139.   Plaintiff is a California non-profit corporation who is injured in his business by reason of Defendants' conduct. Plaintiff's mission and objectives to help its members, victims, by providing humanitarian assistance, and to protect its volunteers in NOSO are harmed and injured by defendants actions.

140.   As a result of defendants violations of 18 U.S.C. §960, plaintiff is entitled to an injunction and declaratory relief.

## FOURTH CAUSE OF ACTION
**Violation of  18 U.S.C. §2339C:  Prohibition against the financing of terrorism**

141.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

142.   Defendants by organizing and coordinating fundraisers, making payments, to the armed groups in Cameroon under their control and supervision, have financed all the harm and injuries to CAVAT's operations, its members, and victims, are in violation of 18 U.S.C. §2339C. Defendants knew or recklessly disregarded that the armed groups would use those funds in full or in part to carry out acts intended to cause death, serious bodily injury, stop humanitarian aid and assistance, and discourage CAVAT volunteers from operating; and that their purpose, as well as that of the armed groups, was to intimidate the Cameroon government and its populations, to grant them separation from Cameroon.

143.   As set forth more fully above, but for the violation of this Statute by Defendants, plaintiffs would not significant harm and irreparable harm to its operations, and possible loss of lives of its volunteers.

144.   By committing violations of 18 U.S.C. § 2339C that have caused the Plaintiffs to be injured in their Los Angeles based business, Defendants are liable.

145.   Defendants provided these services, equipment, and personnel to armed separatist groups, knowing that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the Plaintiff, its members, and victims.

146.   As set forth more fully above, but for the expedition against friendly country engaged by Defendants, Plaintiffs operations would not be significantly at risk, and its volunteers in constant harms way and danger of death, abduction, or torture.

147.   By committing violations of 18 U.S.C. § 2339C that have caused the Plaintiff injury and harm in his business, Defendants are liable to Plaintiffs. Defendants acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 960, 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively.

148.   Defendants acts transcend national boundaries in terms of the means by which they are accomplished because they use armed militias and separatists groups operating in NOSO in order to implement their policy objectives of ungovernable and total lockdown on NOSO; in addition, the persons their actions are intended to intimidate or coerce, and the locale of their armed groups they direct and control, is in NOSO

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

149.   Defendants actions, and their specific attacks in NOSO, are intended (a) to intimidate or coerce the civilian populations of NOSO, the government of Cameroon, and others, to follow their political goals and objectives

( b ) to influence the policy of the Cameroon government by intimidation, coercion, and ( c ) to affect the conduct of the Cameroon government by mass killings, torture, kidnappings, abductions, destruction of property, arson, and cessation of schools in NOSO.

150.   Plaintiff is a California non-profit corporation who is injured in his business by reason of Defendants' conduct. Plaintiff's mission and objectives to help its members, victims, by providing humanitarian assistance, and to protect its volunteers in NOSO are harmed and injured by defendants actions.

151.   As a result of defendants violations of 18 U.S.C. § 2339C, plaintiff is entitled to an injunction and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on all Counts, and seeks such relief as specified below for all Counts for which such relief is provided by law:

a)   A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participation with them from implementing or enforcing any portion of their "total lockdown" orders and making NOSO "ungovernable" and from further violations of:

i.   18 U.S.C. § 956 : Conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country.

ii.   18 U.S.C. § 2339A:  Providing material support to terrorists.

iii.   18 U.S.C. §960 Predicate : Expedition Against Friendly Country.

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

    iv.   18 U.S.C. §2339C : Prohibitions against the financing of terrorism.

 b)   Issuing a **<u>Declaratory Judgement</u>** that: defendants conduct is a violation of the following anti-terrorism statutes:

    i.    18 U.S.C. § 956 : Conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country.

    ii.   18 U.S.C. § 2339A:  Providing material support to terrorists.

    iii.  18 U.S.C. §960 Predicate : Expedition Against Friendly Country.

    iv.   18 U.S.C. §2339C : Prohibitions against the financing of terrorism.

 c)   Awarding Plaintiff all costs and attorneys' fees to the full extent permitted under the applicable law; and pursuant to 18 U.S.C. § 2333(a).

 d)   Awarding any other relief as the Court may deem equitable, just and proper.

Date: February 5, 2020                    Respectfully Submitted,

                                          EMMANUEL NSAHLAI

                                          By: _____/S/_____
                                          NSAHLAI LAW FIRM

                                          EMMANUEL NSAHLAI, SBN (207588)
                                          email: nsahlai.e@nsahlailawfirm.com
                                          3250 WILSHIRE BLVD, STE 1500
                                          LOS ANGELES, CA 90010
                                          Tel (213) 797-0369
                                          Fax (213) 973-4617

                                          Attorney for Plaintiffs

*Cameroon Association of Victims of Ambazonia Terrorism. v. Ambazonia Foundation Inc. et al*
Case .No. _____
Complaint For Injunction and Declaratory Relief

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on February 5, 2020, I directed that the foregoing document be electronically filed and served with the Clerk of the Court by using the CM/ECF system, and

[  ] (By U.S. Mail) I deposited such envelope in the mail at Los Angeles, CA on February 5, 2020 with postage thereon fully prepaid. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Defendant,


By:_____
     EMMANUEL NSAHLAI

-1-
_____ _v._ _____      Case .No. _____
Certificate of Service

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28